## FOSTER v. FIRST NAT. BANK & TRUST CO. OF TULSA et al.

No. 26099. Feb. 9, 1937.

Rehearing Denied March 30, 1937.

Hagan & Gavin, for plaintiff in error.

Benjamin C. Conner and John M. Winters, Jr., for defendant in error First National Bank & Trust Company of Tulsa.

BUSBY, J. In this case a wife mortgaged her separate property to a bank to secure the debt of her husband. Subsequently the bank on several successive occasions granted to the husband extensions of time in which to pay the debt. These extension agreements were accomplished by the execution of renewal notes which differed somewhat in form from the original notes by which the loan was evidenced. All of the notes were signed by the husband alone.

The bank then instituted this action in the district court of Tulsa county against the husband and wife seeking to obtain a personal judgment against the husband and a decree of foreclosure against the property of the wife. The bank was successful, and the wife alone appeals.

In deciding the case the trial court upon request made findings of fact and conclusions of law, to which we shall subsequently refer.

The wife took the position in the trial court and reasserts in this court that she was the surety of her husband; that, being a surety, she was released both by the extensions of time granted her husband and by the changes in the form of the notes evidencing the debt, which changes, she urges, constituted material alterations in the contract under which her property is impressed with a lien for the payment of her husband's debt. It is contended by the wife that these changes were made without her consent.

We have concluded that the decree of foreclosure entered by the trial court was correct. The wife stands in the position of having consented to the extensions of time accomplished through agreements between the bank and the husband and evidenced by renewal notes executed by the husband. The variations in the form of the successive notes did not release the property of the wife, because of the immaterial nature of the changes made. Our conclusion is based upon the facts disclosed by the record and the principles of law applicable thereto.

In May, 1931, John B. Foster, the husband, desired to obtain a loan of $25,000 from the First National Bank & Trust Company of Tulsa. In order to do so, he and his wife, Leona K. Foster, joined in the execution of a deed in which the bank was named as grantee. It was understood that the deed was to be used as a mortgage to secure the loan intended to be made, and Mrs. Foster, who owned the property therein described, authorized her husband to deliver the deed to the bank for that purpose. She herself did not personally go to the bank in connection with the negotiations for the loan. There was some conversation between Mr. and Mrs. Foster about this transaction at the time the deed was executed, but Mrs. Foster, who testified to this conversation, does not relate the same in detail. It does not appear that the details of the note or notes which the husband would be required to execute were discussed between the Fosters, except such discussion as may be implied from Mrs. Foster's statement that she understood the loan was to be for a short time. It is apparent that Mrs. Foster understood that her husband would be required to execute promissory notes when he obtained the loan and that she entrusted him with the details of the transaction.

The deed was delivered to the bank by Mr. Foster as a mortgage and the loan was made. Mr. Foster obtained $15,000 when the deed was delivered and an additional $10,000 a few days later. Separate promissory notes for the respective amounts were executed by him on forms provided by the bank. Though executed on different dates, the notes were so worded as to provide for a corresponding maturity date, which was on or about the 17th day of June, 1931. Each of the notes contained the following provision from which immaterial matter is deleted:

"The * * * sureties * * * agree and consent that the time for its payment may be extended or said note renewed from time to time by agreement between the holder and any of them without notice, and that after such extension or extensions, renewal or renewals, the liability of all parties shall remain as if no extension or renewal had been had. * * *"

On the 17th day of June, 1931, the time of payment of the indebtedness evidenced by the two promissory notes was extended for a period of 30 days, and such extension was evidenced by a single note of corresponding form for the aggregate principal sum of $25,000. Additional extensions were granted in a similar manner until the 10th day of January, 1933, on which date an extension for an indefinite time was granted and evidenced by a renewal note payable on demand. This was the last note executed before the institution of this foreclosure action which occurred on the 29th day of September, 1933.

Interest was charged on the principal amount of the debt throughout the period for which the same remained unpaid at the rate of 6 per cent. per annum. This interest charge was not reflected in the face of the original notes or the subsequent notes evidencing extensions of time for definite periods, the interest charge having been exacted by payments in advance. These earlier notes contained no provision for interest except the requirement that they should draw interest after maturity at the rate of 10 per cent. per annum. The demand note, being of indefinite duration, was not handled in this manner. It contained a provision for the payment of interest at the rate of 6 per cent. per annum from date. It was also on a different form than the earlier notes and contained certain provisions which the trial court determined to be surplusage and therefore immaterial so far as the real estate mortgage herein involved was concerned. Such provisions were:

"In case of depreciation in the market value of any **security pledged** for this note, the maker agrees to deposit on demand additional collateral so that the market value shall always be at least twenty per centum more than the amount of this note, and, in the event he should fail to deposit such additional security, or in the event there should be default in the terms or conditions of this note or in the payment of any sum due thereunder, either principal or interest, the holder of this note is authorized, without demand, to declare the whole sum evidenced by this note immediately due, and payable, and proceed without notice to the makers, indorsers, sureties or guarantors, to take possession and control, and sell said collateral securities, or any part thereof, either at public or private sale, with or without notice, at the option of pledgee, and apply the net proceeds therefrom arising, after deducting all costs and expenses incurred in said sale, or the custody of said securities, including attorney's fees as hereinafter provided, to the payment of such sum as may be due hereunder. said holder, however, to account to the makers, indorsers, sureties, and guarantors herein for the surplus, if any, arising from said sale above the amount necessary to pay off and discharge the indebtedness hereby evidenced, with the right to said holder at such sale, public or private, to purchase the whole or any part of such securities or properties so sold, the said bank shall not be liable for failure to sue on any securities deposited hereunder, but shall only be liable for what it actually collects and receives on account thereof." (Emphasis ours.)

It may be noted at this point that the above-quoted provisions of the promissory note allude to security pledged and that such provisions are entirely inappropriate and in many respects wholly unenforceable in connection with a mortgage on real estate. The use of the word "pledge" itself throughout the quotation above set forth excludes the idea that the provision had any application to a real estate mortgage, since "pledge" in its legal and commercial use alludes only to personal property. 21 R. C. L. p. 630.

Subsequent to the execution of the original note and prior to the extensions of time for payment thereof, Mrs. Foster had a conversation with one of the officers of the bank in which, without alluding specifically to the transactions involved in this case, she urged in general terms that the bank be more lenient in its dealings with Mr. Foster. The trial court concluded that this conversation had reference to the transactions involved herein and amounted to a request for and consent to extensions and renewals. Upon this point the trial court found as a part of its findings of fact:

"7. That, in addition to the agreement as set out in said original notes and in the oral understanding had between Mr. Foster and the bank at the time the deed was delivered that the notes might be renewed or extended, Mrs. Foster is not released by said renewals for the reason that, after the execution of said original notes, she urged the plaintiff bank to be more lenient and, in effect, invited them to grant such extensions and renewals."

It is conceded by the parties to this case that one who mortgages his property to secure the debt of another occupies the position of a surety. See 21 R. C. L. p. 1003, par. 52. It is also conceded that the relationship of husband and wife is not inconsistent with the relationship of principal and surety, and that a wife who mortgages her separate property to secure the debt of her husband becomes his surety in so far as the property thus mortgaged is concerned. See 13 R. C.

L. p. 386. It is also agreed, as we understand the briefs in this case, that in conformity with the general rule of suretyship an extension of time of payment by agreement between the creditor and the husband **without the consent of the wife** operates to release the property of the wife by reason of her status as a surety. See note 5 Ann. Cas. p. 644; 12 Ann. Cas. p. 550.

So far as the extensions are concerned, the gist of the dispute in this case is thus narrowed to the question of whether Mrs. Foster consented to the extensions of time which were granted by the bank. Such consent may be given by a surety either at the time the original contract is made or subsequently. See Arant on Suretyship, p. 300. It may be given by the surety in person or through an agent of the surety who is clothed with actual or apparent authority to give such consent in behalf of the surety. The trial court, in effect, decided that in addition to the relationship of principal and surety existing between Mrs. Foster and her husband at the time the original loan was made by the bank, there also existed the relationship of principal and agent and that Mr. Foster was clothed with the apparent, if not the actual, authority to work out the details of a loan, which included the authority to agree that extensions in the time of payment might be granted. This decision finds support in the Kansas case of Moody v. Stubbs, 146 P. 346, in which the holding of the court bearing directly upon this point was expressed in the first paragraph of the syllabus by the Kansas court in the following language:

"Where a husband and wife execute a deed upon property owned by her, and she entrusts it to her husband to be delivered as security for a note executed by him to the grantee, and the husband, without her knowledge, delivers it under an arrangement made by him with the grantee that the note is to be renewed from time to time, extensions of the time of payment of the debt, made in pursuance of such arrangement, but without the knowledge of the wife, do not effect the release of her property."

In disposing of that case it was said by the court in the body of the opinion:

"As the note was given in pursuance of an arrangement that the time of payment should be extended—an arrangement which, upon the grounds indicated, must be regarded as binding upon Mrs. Moody, although made without her knowledge—the extension of time in pursuance of that understanding did not release her property"

—and at a later point in the opinion it was stated:

"The mortgage—for that was what the transaction amounted to—secured the debt, no matter what form it might take, so that it could be identified. 27 Cyc. 1075. The several renewals of the note did not constitute its payment (30 Cyc. 1195, 1271; note, 35 L. R. A. (N. S. ) 1), notwithstanding that, as each note was given, the old one was surrendered. * * *"

The basis of the opinion, so far as the consent of the wife to the extensions of time therein granted are concerned, is that the surety has created the principal debtor as her agent and clothed him with apparent authority to arrange for an extension of time. The case is so treated in texts dealing with the subject. 21 R. C. L. p. 1023, par. 69, note 5.

Upon careful consideration of the holding of the Kansas court, we approve and adopt the doctrine therein announced.

As an additional reason for concluding that the wife as surety in the transactions involved in the case at bar had consented to an extension of time, the trial court decided that she had made a request for such extensions, which request was tantamount to consent. This view finds support in principle in the Utah case of Musser v. McCormick & Co., 192 P. 1052. However, our determination that Mr. Foster was clothed with apparent authority by his wife to arrange for extensions of time in connection with the original loan at the time it was made dispenses with the necessity of discussing this additional feature of the case.

Mrs. Foster also complains that the contract was altered in other material respects without her consent. One of the complaints is directed at the interest provisions of the various notes. It was pointed out by her that the original notes called for interest after maturity at the rate of 10 per cent. per annum, and that when these notes were extended after the maturity date of the original note, the 10 per cent. per annum was not charged, but that on the renewal notes only 6 per cent. was paid or provided for. It is, of course, a general rule of suretyship that a material alteration of a contract may release the surety, even though the alteration may be beneficial to the surety. However, we do not regard this method of handling the interest as an alteration of the contract. The effect of the extension of time of payment was to postpone the maturity date, and since such extensions were agreed to by Mrs. Foster in the manner

which we have previously discussed, it was, of course, proper, as an incident to such extensions, to postpone the collection of 10 per cent. interest until the maturity date fixed by virtue of the extensions.

It is also urged by Mrs. Foster that the change in form of the notes from notes having a definite maturity date to a demand note constituted a material alteration. The original note which contemplated future extensions did not limit the extensions which might be granted to those fixing a definite time. There is authority to the effect that the taking of a demand note does not constitute an extension of time and therefore will not operate to release the surety, even where consent to extensions of time is not given. See Farmers State Bank v. Fausett (N. D.) 210 N. W. 638, 48 A. L. R. 1219, and annotation at page 1222. However, treating the demand note as an extension of time in this case, it is as much within the purview of the original agreement authorizing extensions of time as were the earlier notes fixing a definite time.

Mrs. Foster also asserts that the provisions of the last or demand note relating to pledged property contituted an unauthorized alteration which operated to release her. For the reasons previously stated, we conclude, as did the trial court, that those provisions related to personal property exclusively, and could not be construed to affect or change her rights with reference to the mortgaged real estate involved herein in any respect. They were, therefore, as far as she was concerned, surplusage in the note and consequently immaterial.

The decision of the trial court, being in accord with the views herein expressed, is affirmed.

OSBORN, C. J., and PHELPS, CORN, and GIBSON, JJ., concur.